**AMERICAN TRI–ERGON CORPORATION et al. v. GENERAL TALKING PICTURES CORPORATION et al.**

**No. 798.**

District Court, D. Delaware.
Aug. 30, 1934.

S. Mortimer Ward, Jr., and Page S. Haselton, both of New York City, and Hugh M. Morris, and Arthur G. Logan, of Wilmington, Del., for plaintiffs.

Samuel E. Darby, Jr., of New York City, and E. Ennalls Berl (of Ward & Gray), of Wilmington, Del., for defendants.

NIELDS, District Judge.

This suit is brought under section 4915 of the Revised Statutes, as amended March 2, 1927, c. 273, § 11, March 2, 1929, c. 488, § 2 (b), 35 USCA § 63, for a decree authorizing and directing the Commissioner of Patents to issue a patent embodying the claims in issue to the plaintiff American Tri-Ergon Corporation; the issuance of such patent having been refused by the Commissioner of Patents upon the application of the plaintiffs Josef Engl, Joseph Massolle, and Hans Vogt, which application was assigned to the plaintiff American Tri-Ergon Corporation.

Section 4915, as amended, provides: "Whenever a patent on application is refused by the Commissioner of Patents, the applicant, unless appeal has been taken from the decision of the board of appeals to the United States Court of Customs and Patent Appeals, and such appeal is pending or has been decided, in which case no action may be brought under this section, may have remedy by bill in equity, if filed within six months after such refusal; and the court having cognizance thereof, on notice to adverse parties and other due proceedings had, may adjudge that such applicant is entitled, according to law, to receive a patent for his invention, as specified in his claim, or for any part thereof, as the facts in the case may appear. And such adjudication, if it be in favor of the right of the applicant, shall authorize the commissioner to issue such patent on the applicant filing in the Patent Office a copy of the adjudication and otherwise complying with the requirements of law. In all cases where there is no opposing party a copy of the bill shall be served on the commissioner; and all the expenses of the proceedings shall be paid by the applicant, whether the final decision is in his favor or not. In all suits brought hereunder where there are adverse parties the record in the Patent Office shall be admitted in whole or in part, on motion of either party, subject to such terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court may impose, without prejudice, however, to the right of the parties to take further testimony. *The testimony and exhibits, or parts thereof, of the record in the Patent Office when admitted shall have the same force and effect as if originally taken and produced in the suit.*" (Italics supplied.)

The invention relates to a "glow lamp" for the photographic recording of sound. The Examiner of Interferences awarded priority of invention to Lee De Forest, and his decision was affirmed by the Board of Appeals. Thereafter this suit was brought. I have read the depositions submitted in the interference proceeding in the Patent Office; I have had the advantage of hearing the testimony of witnesses in open court, particularly certain new testimony discrediting the findings of the Patent Office; I have had the additional advantage of reading the exhaustive opinion of the Canadian court holding the Ca-

nadian patent to De Forest invalid. The testimony and evidence produced in the District Court in character and amount carry thorough conviction that the Patent Office erred in granting the patent to Lee De Forest and in refusing to grant the patent to Josef Engl et al.

The ordinary open arc lamp with which the public became familiar from its use in street lighting is an electrical apparatus in which a positive and negative electrode, usually of carbon, are struck together and then automatically separated by a short distance, thereby establishing an arc which causes a brilliant illumination. An arc lamp, however, may be inclosed in a glass shell. It may be filled with gas. The composition of the electrodes may be other than carbon, such as tungsten. The chief characteristic of an arc lamp when used as such is that it is only capable of being maintained by comparatively low voltages and requires comparatively large electric currents. A very large percentage, probably from 80 to 85 per cent., of the light from an arc emanates from the electrodes which are incandescent. Only a small proportion is produced by the arc stream itself. Owing to the high temperatures prevailing in an arc lamp, it is necessary that the electrodes which are placed closely together be of a material with a high melting point. If the melting point be low, the electrodes would rapidly burn away. The arc flame is bright and rigid and does not modulate or respond read-ily to high frequency changes in current voltages. The light from the incandescent electrodes shows little of the far blue and ultraviolet end of the spectrum. For this reason it is not rich in actinic properties.

Generally a glow lamp consists of a glass inclosure containing two electrodes and filled to the required degree with a gas such as nitrogen, argon, helium, etc., or a mixture of gases. On a difference of potential being applied to the electrodes, a suitable gas being used, and a low gas pressure being employed, an electrical discharge passes between the electrodes. The gases being thus excited electrically, a soft velvety light appears near or around the cathode which is the negative electrode. This light is known as the negative glow and always appears close to the cathode. The glow arises in the gas itself. A glow discharge requires a comparatively high voltage and a comparatively low current. In contradistinction to the arc lamp, the negative glow is rich in ultraviolet rays or in actinic properties. A glow lamp has the desirable property that the entire amount of light in the glow is changed when the current through the glow tube is correspondingly modulated.

The bill of complaint avers, in substance, that on June 2, 1919, plaintiffs Josef Engl, Joseph Massolle, and Hans Vogt filed a joint German application for a patent for a "Process of making Photophonograms"[1]; that on June 3, 1919, they filed another joint German application for a patent for a "Process of

---

[1] Extracts from German application of June 2, 1919:

"Process of making photophonograms.

"The invention provides as source of light, the use of the radiation that rarified gases emit under the influence of electric excitation, a known circumstance which in physics is called *glow light discharge.* * * *

"It can easily be seen that the use of *glow discharge* in the way here sketched is of decisive importance. First, *in contrast with the conditions with an arc discharge,* the electrical output necessary for maintaining the discharge is considerably less so that the alternating currents excited by the sound proceeding which are never too strong are still sufficient in relation to the mean energy consumption to produce a suitable effect on the discharge operation. (Arc discharges have already been used for similar purposes, attention being called to the Ruhmer experiments with carbon arcs and mercury vapor lamp). Moreover with arc discharge it can be said that there is according to definitions a greater development of heat at the electrodes; this causes a not to be under-estimated inertia of the whole discharge operation which with the requirement that the source of light shall follow the most rapid acoustic frequencies is very much of a hindrance. That the *glow light discharges* have the power of following the most rapid electric variations is evident from the known use of the Gehrcke glow light oscillograph tube for testing high frequency oscillations. Of necessity, the fluctuations of the discharge, which occur with the arc on account of lack of homogeneity and presence of impurities in the vaporizing electrode material, are prevented with the glow discharge. The gas used in the luminous tube is so selected that the length of wave of the light emitted is as effective as possible photographically.

"Claim:

"Process of making photophonograms, especially for the purpose of acoustic cinematography, characterized in that a *glow light discharge* is used as acoustically impressed source of light." (Italics supplied.)

making Photophonograms"[2]; that on April 4, 1921, they filed a joint application "for the grant of Letters Patent of the United States for the aforesaid invention, Serial No. 458,- 631, entitled 'Means for Recording and Reproducing Sound,'" the title being subsequently changed to "Means and Method of Photographically Recording Sound,"[3] which

---

[2] Extracts from German application of June 3, 1919:

"Process of making photophonograms.

"In the case shown in Fig. 1, side variation is used. *The negative glow light is there used, appearing at the cathode of a glow light tube* R when it has the shape of a long straight wire (d in Fig. 1) or a narrow metal strip. The length of this *cathode light* is reasonably proportionate to the discharge current. The phenomenon that even high frequency discharge operations take place without much inertia, has been used for a long time as Gehrcke glow light oscillograph for photographic testing of alternating current. In the case shown in Fig. 1, acoustically impressed high frequency is provided as *glow light* current which causes a luminous layer of varying length on both the electrodes alternately acting as cathode. The pencil of rays acting on the film is made the desired dimensions by a lens system 1 and a slits. By means of a reflector not shown, the light intensity acting on the film can increase. For answering the purpose, the amount of light projected is so great that the film is overexposed at the illuminated places. The developed film then has the appearance of Fig. 3. If instead of high frequency, acoustically impressed direct current is used as *glow light* current the film will have the appearance of Fig. 4. * * *

"Claims:

"1. Process for making photophonograms according to the application of May 29, 1919, characterized in that the varying length of the *cathode glow light* causes transverse shadows of varying length on the film. * * *" (Italics supplied).

[3] Extracts from application of German scientists for United States patent:

"Method for the Production of Photophonograms, particularly for the purposes of acoustic kinematography of which the following is a specification.

"For the purposes of acoustic kinematography there has been used hitherto a source of light *generally an arc* which is adapted to be influenced by sound vibrations under definite conditions.

"The use of *arc discharges* for the photographic recording of sound vibrations has however the disadvantages that owing to the *inertia of the arc* comparatively large vibrations or resistance are required to an appreciable influence which is sufficient for photographic purposes. *The further difficulty,* of ensuring the required constancy in the intensity of the light and particularly of preventing *the arc* from becoming totally extinguished periodically, has hitherto not led to a practically satisfactory method of enabling the optical and particularly the photographical recording of sound waves for the purposes of acoustic kinematography. * * *

"*This invention provides* means for producing photophonograms, particularly for acoustic kinematography, by means of a source of light which ensures solely the influencing by sound waves without bringing itself any source of error into the procedure. With this object in view the *glow light* discharge known of itself for other purposes and which is dependent on the strength of the current in the discharge tube is used as the source of light. As *glow light tubes* can be operated by small currents, relatively and absolutely small alterations of resistance suffice, in contradistinction to the hitherto known sources of light, in order to obtain great fluctuations of intensity with a sharper and more rapid control of the intensity of the light. Consequently the most accurate and the finest photographic recording of the sound vibrations is possible.

"The photographic influence upon the moving strip of film, sensitive to light, must be effected in such a manner that, by means of acoustically controlled source of light (*glow light*), linear transverse blackenings are produced which stand perpendicular to the direction in which the strip of film is fed forward.

"* * * Owing to the small amount of electrical power necessary to keep up the *glow light discharge* only small alternating currents excited by the sound operation are required for their control, and are sufficient to allow the source of light to follow the most rapid of acoustic frequencies. The gas used in the light tube is preferably so selected that the wave length of the light emitted has the best possible photographical effect.

"The method for the lateral variation of the width of the blackening can, as shown diagrammatically in Fig. 1, be carried out in a manner that the *negative glow light* is used which is produced at the *cathode of a glow light tube* R, when it has the form of a long straight wire *d* or of a narrow strip of sheet metal. The length of this *cathode light is fairly in proportion to the discharge current.* * * *

"We claim:

"1. A method for the production of photophonograms in particular for the purposes of acoustic kinematography ac-

application was assigned to the plaintiff American Tri-Ergon Corporation subject to a license for certain purposes to plaintiff Tri-Ergon Holding A. G. All of these applications were for the same invention.

The answer admits the averments of the bill that on September 18, 1919, defendant Lee De Forest filed "an application for Letters Patent of the United States, Serial No. 324,683, for Means for Recording and Reproducing Sound,"[4] in which he described two forms of lamps acted upon by acoustically modulated current for recording sound, to wit, an incandescent filament lamp and an arc

cording to which a *glow light discharge* which is controlled by sound vibrations is used as the source of light.

"2. A method for the production of photophonograms, especially for purposes of acoustic kinematography according to which a *glow light discharge* which is controlled by sound vibrations is used as the source of light, the acoustic variation of the blackenings being effected by the *negative glow light* of a linear or equivalent cathode so that transverse blackenings of *different length appear on the film.*

"3. A method for the production of photophonograms, especially for purposes of acoustic kinematography according to which a *glow light discharge* which is controlled by sound vibrations of the blackenings being effected by the *negative glow light of a linear or equivalent cathode* so that transverse blackenings of different length appear on the film, a capillary being used as a glow light tube in order to change the lighting or illuminating intensity whilst through the light with interposition of an absorption wedge, blackenings of constant breadth are produced upon the film.

"4. A method for the production of photophonograms, especially for purposes of acoustic kinematography according to which a *glow light discharge* which is controlled by sound vibrations of the blackenings being effected by the *negative glow light of a linear or equivalent cathode* so that transverse blackenings of different length appear on the film, a capillary being used as a *glow light tube* in order to change the lighting or illuminating intensity whilst through the light with interposition of an absorption wedge, blackenings of constant breadth are produced upon the film, the glow light tube being inserted directly in the anode circuit of the (last) reinforcer tube when a reinforcing device is being used.

"5. A method for the production of photophonograms, especially for purposes of acoustic kinematography according to which a *glow light discharge* which is controlled by sound vibrations of the blackenings being effected by the *negative glow light* of a linear or equivalent cathode so that transverse blackenings of different length appear on the film, a capillary being used as a glow light tube in order to change the lighting or illuminating in-

tensity whilst through the light with interposition of an absorption wedge, blackenings of constant breadth are produced upon the film, the glow light tube, when a reinforcing device is used, being coupled in a transformer like and variable manner with the anode circuit of the (last) reinforcer tube."

[4] Extracts from De Forest application of September 18, 1919:

"Means for recording and reproducing sound.

"In place of the above described incandescent lamp method of controlling by sound waves the light intensity I may use a *small arc lamp* as shown in Fig. 6. Such lamp preferably consists of two *heavy tungsten ball electrodes* 50 and 51, separated by a *small gap, for example, 0.5 millimeters,* mounted in a small glass vessel 52, either *evacuated or filled with some gas, such as nitrogen, mercury vapor,* etc., to make the light from such *arc* as rich as possible in ultra violet rays. I energize such *arc* from a source of high frequency current, the frequency of which must be well above the audible limits, and modulate the high frequency currents supplied the *arc lamp* with alternating or pulsating currents set up by and in accordance with the sound waves. * * *"

Claims:

"10. The combination with a photographically obtained sound record, of means controlled by said record for producing an electric current varying in potential in accordance with said record, an audion amplifier for amplifying said current, and a *sound producer* controlled by the output circuit of said audion, and means controlled by the record for controlling the current supplied the filament of said audion to thereby control the volume of the sound produced by said producer."

"18. Means for producing talking motion picture films comprising a motion picture camera, and means for exposing a portion of the film to *sound controlled light.*"

"21. In a system for photographically recording sound on a traveling sensitized surface, *a light emitting device*, means for normally maintaining said device at *a constant source of brilliancy,* and means for varying the degree of brilliancy of said

lamp, upon which application a patent issued to De Forest containing no claims for the invention here at issue; that meanwhile on November 11, 1920, De Forest filed another application for a patent for "Means for Record-ing and Reproducing Sound,"[5] said application being a division of his first application in which he described only one of said types of lamps for recording sound, namely, an arc lamp; that some time after the grant and

---

light by and in accordance with the sounds to be recorded."

"23. In a system for photographically recording sound on a traveling sensitized surface, *an electric lamp*, a source of *constant potential for normally maintaining said lamp lighted at a predetermined degree of brilliancy*, and means for varying said potential by and in accordance with the sounds to be recorded."

"34. The combination with an alternating current lamp for emitting *a constant source of light*, an oscillion for supplying high frequency oscillations to said lamp, and means for modulating said high frequency oscillations by and in accordance with sound waves to produce corresponding modulation in the light emitted by said lamp."

[5] Extracts from De Forest application of November 11, 1920:

"Means for recording and reproducing sound.

"In accordance with my present invention I employ a small arc lamp 52, preferably consisting of *two heavy tungsten ball electrodes* 50 and 51, separated by a *small gap, for example, 0.5 millimeters*, mounted in the small vessel 52, *either evacuated or filled with some gas*, such as nitrogen, mercury vapor, etc., to make the light from such arc as rich as possible in ultraviolet rays. The light rays from the *arc lamp* pass through the lens 3 in the usual well known manner and in addition thereto, if desired, through a *color filter* 4, which color filter is preferably of a dark blue, as I have found that the best results of recording sound waves photographically are thus secured. A photographic film 7 is passed by the lens and film 3 and 4 respectively in the usual well known manner and the light emanating from the lamp is recorded on the film, preferably in the nature of a minute ray obtained from a *pin point aperture* or focused to a point by a lens. I energize the *arc lamp* 52 from a source of high frequency current, the frequency of which must be well above the audible limits and modulate the high frequency currents supplied the *arc lamp* with alternating or pulsating currents set up by and in accordance with sound waves."

Claims:

"1. The method of photographically recording sounds which consists in exposing a traveling sensitized surface to a constant source of light, and varying the intensity of the light by and in accordance with the sounds to be recorded.

"2. In a system for photographically recording sound on a traveling sensitized surface, a light emitting device, means for normally maintaining said device at a constant source of brilliancy, and means for varying the degree of brilliancy of said light by and in accordance with the sounds to be recorded.

"3. In a system for photographically recording sound on a traveling sensitized surface, a light emitting device, means for normally maintaining said device at a constant source of brilliancy, and electrically operated means for varying the degree of brilliancy of said light by and in accordance with the sounds to be recorded.

"4. In a system for photographically recording sound on a traveling sensitized surface, an electric lamp, a source of constant potential for normally maintaining said lamp lighted at a predetermined degree of brilliancy, and means for varying said potential by and in accordance with the sounds to be recorded.

"5. In a system for photographically recording sound on a traveling sensitized surface, an electric lamp, a source of constant potential for normally maintaining said lamp lighted at a predetermined degree of brilliancy, and means for impressing sound controlled currents of varying potential upon the circuit of said lamp.

"6. The combination with a light emitting device, of means for controlling the degree of brilliancy of said device by and in accordance with sound waves.

"7. The combination with an alternating current lamp for emitting a constant source of light, and means for supplying an alternating current to said lamp, the periodicity of which is above the audible limits.

"8. The combination with an alternating current lamp for emitting a constant source of light, and means for supplying an alternating current to said lamp, the periodicity of which is above the audible limits, and means for varying the alternating current so supplied by and in accordance with alternating currents, the periodicity of which is below the audible limits.

"9. The combination with an alternating current lamp for emitting a constant source of light, and means for supplying an alternating current to said lamp, the periodicity of which is above the audible limits, and means for varying the alternat-

publication of foreign patents to Engl, Massolle, and Vogt for the same invention here at issue De Forest for the first time made the claims here at issue, and hereinafter set forth; that on January 29, 1924, letters patent of the United States No. 1,482,119 were granted to the De Forest Phonofilm Corporation as assignee of De Forest, containing the following claims for the invention at issue, constituting the counts of the issue:

Count 1 (claim 7 of the De Forest patent). "Means for photographically recording sound waves comprising an enclosed luminous gas discharge device, means for constantly maintaining said device effectively luminous, and means for varying the luminosity of said device by and in accordance with sound waves, and means for directing the light from said device to a sensitized element."

Count 2 (claim 8 of the De Forest patent). "Means for photographically recording sound waves comprising an enclosed luminous gas discharge device, means for constantly maintaining said device effectively luminous, and means for varying the luminosity of said device by telephone currents, and means for directing the light from said device to a sensitized element."

Count 3 (claim 9 of the De Forest patent). "The method of photographically recording sound which comprises varying the luminosity of an effectively constantly luminous enclosed gas discharge device by and in accordance with sound waves."

Count 4 (claim 10 of the De Forest patent). "The method of photographically recording sound which comprises varying the luminosity of an effectively constantly luminous enclosed gas discharge device by and in accordance with telephonic currents."

Count 5 (claim 5 of the De Forest patent). "Means for photographically recording the sound waves, comprising an electrically lighted lamp, means for constantly supplying high frequency oscillating current to said lamp to light the same, means for controlling said lamp by and in accordance with sound waves, and means for directing the light from said lamp to a sensitized element."

Count 6 (claim 6 of the De Forest patent). "Means for photographically recording the sound waves, comprising an electrically lighted lamp, means for constantly supplying high frequency oscillating current to said lamp to light the same, means for controlling said lamp by and in accordance with low frequency currents, and means for directing light rays from said lamp to a sensitized element."

### Search by De Forest for Operative Light Source after Filing His 1919 Application.

For more than two years after filing the 1919 application De Forest was engaged in laboratory experiments. One of the principal objects of the experiments was to find an operable light source. De Forest testified he had three light sources in mind—a speaking flame, a fine incandescent filament lamp, and a "glow tube light." He filed an application for a patent on the incandescent filament lamp. This was the first of his lamps to be tried out during 1919 and 1920. It would not respond to high voice frequencies without being blown out by heavy voice currents, so he abandoned that idea. De Forest also applied for a patent on the use of the speaking flame with highly actinic gas. He started to try this out in the summer or fall of 1919 and continued with it through the year 1920 until July, 1921. He never used the speaking flame commercially and eventually abandoned it. These proposals were failures like his tungsten ball arc lamp. Regarding the entries in his laboratory notebooks as late as 1921, De Forest testifies: "A perusal of this and the following notebook shows in countless instances that I was having trouble in obtaining satisfactory photographic records of sound without over-heavy—over-long—development of the negative and consequent fogging of the same." With all his skill and labor, De Forest was unable to successfully record sound from the teachings of his application.

ing current so supplied by and in accordance with sound waves.

"10. The combination with an alternating current lamp for emitting a constant source of light, an oscillion for suppyling high frequency oscillations to said lamp, and sound controlled means for modulating said high frequency oscillations.

"11. The combination with an alternating current lamp for emitting a constant source of light, an oscillion for supplying high frequency oscillations to said lamp, and means for modulating said high frequency oscillations by and in accordance with sound waves to produce corresponding modulation in the light emitted by said lamp.

"12. The method of photographically recording sounds which consists in exposing a traveling sensitized surface to an arc lamp and varying the intensity of the light emitted from said arc lamp by and in accordance with the sounds to be recorded."

About this time De Forest visited Dr. Robert W. Wood in his laboratory at the Johns Hopkins University. Dr. Wood, it may be remarked, was professor of experimental physics at the University, and had been engaged in research work in connection with vacuum tubes, optical phenomena, and related subjects for over thirty years. He testified:

"Q. 51. Please state on what occasion you first had a conversation with him in regard to the making of photographic sound records? A. Mr. De Forest visited me at my laboratory in Baltimore in the fall of either 1920 or 1921, for the purpose of asking my advice about light sources suitable for sound recording and reproduction. I remember that at the time of his visit I had completed my first series of experiments on the spectrum of hydrogen contained in very long vacuum tubes, which was published in Proceedings of the Royal Society in November 1920. Mr. De Forest told me at the time that he was working with a sensitive flame, but that he had also tried the incandescent lamp, and I think he said the arc, for I remember speaking of the fluctuations of filament intensity which I had seen in Paris, France, several years before, operated on a 60-cycle current. I remember asking him why he employed sources of light which were dependent upon incandescent solid matter, rather than sources of light employing the luminosity of an ionized gas, such as the vacuum tube discharge, with which I was working at the time. As nearly as I can remember, this struck Mr. De Forest as a new idea, and he asked me what gases I considered would be most suitable for filling the tubes. I suggested that either hydrogen or argon would probably prove suitable, owing to the comparatively large amount of actinic light—that is, light photographically active."

Here was a new and vital suggestion. The light source should be ionized gas, not incandescent electrodes.

In 1921 De Forest picked up a fresh trail that led him to Germany, where he spent the month of August and learned from Dr. Seibt, an old acquaintance, of the activities of Engl, Massolle, and Vogt in developing talking moving pictures. Returning to Berlin in October, 1921, De Forest remained there until September, 1922. During that year he carried on experimental work relative to a light source in a laboratory rented from Dr. Seibt and previously occupied by Engl, Massolle, and Vogt. The general character of the work of these three scientists was common knowledge in Berlin at the time. It was published in newspapers and magazines of that date. "Talkie" film manufactured by these men and used with excellent results was shown to De Forest. Moreover he was thrown into personal contact with Josef Engl. An important step in De Forest's pursuit of an operable glow lamp for recording sound followed his introduction to Dr. Gehrcke by Dr. Seibt. He obtained from Dr. Gehrcke some gas discharge glow lamps of the dumb-bell type which he brought to the United States. This dumb-bell glow lamp was used until December, 1922, when De Forest adopted a glow lamp invented by T. W. Case. A witness tells of this step:

"Q. 33. You stated a few questions back, did you not, that the apparatus brought from Germany was used by Dr. De Forest until some time in December, 1922? A. Yes.

"Q. 34. Do I understand then, that he changed over to some other form of apparatus at that time? A. In December we used Mr. Case's recording light.

"Q. 35. When did Dr. De Forest begin to use Mr. Case's recording light, if you remember? A. I should judge around the 16th or 17th of December, 1922. It was the 17th, I believe.

"Q. 36. What were the circumstances, if you know, leading up to the adoption of Mr. Case's recording light? A. There was a long distance telephone call from Mr. Case to Dr. De Forest to come up to Auburn, N. Y., to listen to a recording light that Mr. Case had invented, and the doctor went up that night. I was alone in the studio making some experiments that the doctor told me to make, and the next day the doctor came back with a light that he had gotten from Mr. Case and a change was made in the camera to accommodate this light in the place of his original light, and we got fair results at the start with this light."

February 6, 1923, the German patents for apparatus "distinguished by the fact that the source of light is a glow discharge controlled by the sound vibrations," applied for by Josef Engl, Joseph Massolle, and Hans Vogt on June 2, 3, 1919, were published in Germany. April 4, 1923, two months after the publication of the German glow light patents, De Forest added the following additional claims to his application:

"7. Means for photographically recording sound waves comprising luminous gas discharge device, means for constantly maintaining said device luminous, and means for varying the luminosity of said device by and in

accordance with sound waves, and means for directing the light from said device to a sensitized element.

"8. Means for photographically recording sound waves comprising a luminous gas discharge device, means for constantly maintaining said device luminous, and means for varying the luminosity of said device by telephone currents, and means for directing the light from said device to a sensitized element.

"9. The method of photographically recording sound which comprises varying the luminosity of a constantly luminous gas discharge device by and in accordance with sound waves.

"10. The method of photographically recording sound which comprises varying the luminosity of a constantly luminous gas discharge device by and in accordance with telephonic currents."

The above claims constitute the last four claims of the De Forest patent in issue. They disclosed for the first time a glow discharge light or glow lamp, and were not inserted in the De Forest application of 1919 until April 4, 1923.

De Forest's Sketch Made at Sea in 1918.

■ It is now appropriate to consider a paper or sketch offered as proof of the date of the conception and disclosure by De Forest of his invention of a glow discharge lamp for recording sound. The sketch is dated October 12, 1918. Three general observations may be made regarding it: (1) The sketch was drafted, in part at least, by De Forest on a British ship in mid-ocean and placed in a volume of poetry, where it remained forgotten for seven years both by De Forest and by Mr. Darby, to whom the original draft was submitted. It came to light for the first time in 1925 when Mr. Darby asked De Forest for any papers relating to the invention. (2) It is incredible that all the entries were on this paper in their present form before the filing of the De Forest 1919 application. It is impossible that De Forest in 1918 knew about a "glow light tube," a "gas filled lamp," the use of "helium" and "argon," "platinum electrodes," and a "fine slit," all features of a glow lamp and shown in the sketch, yet in 1919 files an application, which he claims was for a glow lamp and omits *all these features*. (3) Assume the sketch is unaltered since 1918, it is no part of the De Forest patent in issue and cannot be read into the specification of that patent. If the application does not disclose the invention, as I hold in this opinion,

then the patent cannot be aided or bolstered up in the slightest degree by the sketch.

These general observations may be further elaborated. In the application and patent of De Forest, the light of the lamp is described only as an "arc light," whereas in the 1918 sketch the light is termed " 'Glow tube'. light." The lamp in the patent may be "either evacuated or filled with some gas," which negatives the idea of a glow light. The sketch contains no such statement. The patent mentions only "nitrogen, mercury vapor, etc.," as gas for the lamp, whereas the sketch mentions "hydrogen, helium, nitrogen or argon, or Hg. [mercury]." The record shows that helium and argon are very desirable gases for a glow lamp.. The patent discloses the use of tungsten for electrodes which is highly useful for an arc lamp, but very undesirable for a glow lamp. The sketch discloses "electrodes of plat." which are excellent for a glow lamp. The patent discloses the use of a "pin point aperture," inadequate for a glow lamp, yet the sketch discloses a "fine slit," appropriate for a glow lamp. The plain fact of the matter is that the sketch fairly discloses what De Forest claims to have done two or three years after his application of 1919, but not the year before that application.

That the sketch was forgotten for seven years clearly appears from the testimony. In the District Court De Forest testified: "XQ. 195. With regard to your Cunard boat sketch, did you not testify in your New York deposition in the Canadian case, commencing at page 71, that is the New York deposition, as follows: 'Q. 318. That original sketch, Exhibit 1, what became of that after you made it on the boat? A. I gave it to Mr. Darby when the Interference was declared. Q. 319. You gave it to him about 1925. Where was it between that—A. It was in the book of poems which I had on the boat and which I have kept ever since. Q. 320. Did you discover it more or less by accident at the time of the Interference? A. Yes. Q. 321. It had remained accidently in the book during that period? A. Yes.' Did you give that testimony? A. Yes."

Mr. Darby deposed that aboard ship in 1918 De Forest explained his ideas "with how much detail, beyond what is contained in that writing, all of which I read, I can not now state." Mr. Darby definitely recalled he did not understand how sound could be reproduced until De Forest explained the old art on that subject; further, that he was very pessimistic about the future of talking motion pictures and was very much upset that Dr. De

Forest was contemplating diverting his attention from the radio field. He states, "I gave the paper back to Dr. De Forest and had entirely forgotten about the matter until he mailed it to me in 1925 in response to my request to furnish what written data he could find bearing on the subject matter of this Interference."

De Forest admits that in 1918 he knew of no glow light suitable for the purpose. This admission reveals his real state of mind at the time he made the sketch of 1918.

"XQ. 196. With respect to the same sketch, did you not testify in that same New York deposition for the Canadian case, at page 18 as follows: 'Q. 78. Now, in this sketch, Exhibit 1, you refer to a glow tube light. At the time of making your sketch, what glow tube lights were known to you? A. A great variety of Geissler tubes, and also the Moore tubes for illuminating purposes. Q. 79. Did you at that time think that any of these existing tubes would be suitable for the purpose? A. Not without considerable modification. Q. 80. Well, the situation would then be that you thought you could make a tube that you thought would be satisfactory? A. Yes. Q. 81. But you did not know of any existing tube that would? A. No. Q. 82. Were you familiar with the Gehrcke tube? A. No, I never heard of the Gehrcke tube until I went to Germany in the fall of 1921.' Did you give that testimony? A. I did."

Here De Forest admits that at the time of making the sketch he knew of no glow tube suitable for the purpose. Also he admits that he never heard of the tube that proved his first successful lamp, namely, the Gehrcke tube obtained in Germany in the fall of 1921. It is perfectly clear that in 1918 De Forest had not conceived any operative means for photographically recording sound.

### De Forest Test Lamps.

The De Forest test lamps offered as exhibits on his behalf in the Patent Office to prove his patent operable do not follow the teachings of his patent. These tests constituted De Forest's sole evidence that his patent disclosed an operative lamp. The Patent Office relied on these exhibits in awarding priority of invention to De Forest. The test lamps followed the patent teaching in having closely spaced tungsten electrodes. They were otherwise so fashioned that they yielded a glow light. In seven essential particulars De Forest departed from the teachings of his disclosure in constructing these test lamps. The test lamps do not represent what one skilled in the art would build from the information contained in the De Forest specification as of 1919. There is no more convincing proof that the lamp disclosed in the De Forest patent is inoperative for the purpose than De Forest's inability to produce an operative lamp without departing from the teaching of his patent.

The seven departures in the test lamps are as follows: (1) The test lamps were built in such manner that they were only capable of operating as glow lamps and not as arc lamps. When counsel for Engl et al. asked De Forest to produce an arc discharge between the electrodes of any one of these three lamps, the request was refused because it would destroy the lamp. This disposes of the opinion of the Patent Office that the De Forest patent could be operated either as an arc lamp or as a glow lamp by mere regulation of the electric current. (2) In these three test lamps De Forest utilized a special mixture of gases— 80 per cent. nitrogen and 20 per cent. argon. The De Forest application and patent do not mention argon, and no mention is made of any mixture of gases. In the District Court De Forest testified that he first obtained information about a mixture of gases from Dr. Case in December, 1922, and that he did not know of the relative proportion of the gases until 1926. Prof. Ballard testified that the special mixture of gases was largely responsible for any success in the operation of the test lamps. This information was after-acquired knowledge and is new evidence in this case. (3) De Forest testified in the District Court that in making these lamps they were not "evacuated or filled" as taught in his patent, but that they were "both evacuated and then filled." He expressly admits that "evacuated or filled" was not properly descriptive of these lamps. This admission is new evidence in this case. (4) In the three test lamps the electrodes were covered with insulating sleeves which prevented any flickering along the supports and concentrated the glow around the electrodes. This departure from the De Forest disclosure was revealed by Prof. Ballard at the trial of this case and was concealed by De Forest in the Patent Office proceedings. On cross-examination in the Patent Office De Forest was questioned about the appearance of the heavy supports. Instead of stating that this was due to insulating material around the supports, he concealed the use of sleeves by his answer that: "This diameter was deemed sufficient to maintain the necessary degree of rigidity to keep the electrodes permanently in the desired positions." The

use of these insulating sleeves was essential to the success of the lamps. They were a new conception foreign to his disclosure. The use of these insulating sleeves is new evidence which impeaches the validity of the test lamps. (5) De Forest used flattened electrode tips in his test lamps instead of "balls" as specified in the De Forest disclosure. Electrodes of the ball shape in the cylindrical tube do not permit light variations in harmony with the current, according to the testimony of Josef Engl. As a result, intelligible reproduction is not obtained. (6) In these test lamps De Forest utilized cylindrical tubes and not the spherical bulbs of his disclosure. This is a departure from his patent. It gave him the advantage of getting the light closer to the shell of the lamp and avoiding trouble from the expansion of the lead-in wires, as pointed out in No. 5. (7) In these test lamps De Forest took advantage of the experience and knowledge accumulated in the art from 1919 until 1927. He used modern amplifiers, oscillators, modulators, and microphones.

#### De Forest 1919 Application for Patent in Issue.

Patent No. 1,482,119, granted to De Forest by the Patent Office and here in issue, describes a form of light identical with his 1919 application disclosure. In this patent the term "arc lamp" or "arc light" appears in seven places. Prior to his 1923 amendment both in the parent application and the division thereof we find the lamp always referred to as an arc lamp and never as a glow lamp. Prof. Ballard testified that the De Forest disclosure is scientifically accurate as describing an arc light and "there is nothing in his [De Forest] specification which indicates any other type than an arc lamp." Dr. Wood testified as follows:

"XQ. 76. Would you say that it is a fair inference to draw, disregarding the use of the word 'arc' in the patent, that a glow discharge may have been intended? A. I see nothing in the patent that would lead me to infer that a glow discharge had been used."

Dr. Engl, a physicist of high standing, testified that in physics "arc light" or "arc discharge" is clearly distinguished from "glow light" and "glow discharge."

These opinions of experts are based upon many characteristics of the arc discharge disclosed in the De Forest patent. These characteristics may be summarized as follows: (1) Heavy Tungsten. The outstanding characteristic of tungsten is that it "sputters" when used in the presence of gas at low pressures such as necessary in the glow lamp. A black coating forms on the interior of the glass lamp rendering it opaque to the glow light. If a higher gas pressure is used such as in arc lamps, the sputtering of tungsten does not occur. The use of tungsten in electrodes is very desirable for an arc lamp and is wholly inoperable with the low gas pressures of glow lamps. Heavy tungsten electrodes are desirable for an arc light because tungsten has the highest melting point of all commercially known substances. It is specified for arc lamps in order to insure that the electrodes will withstand the extremely high arc temperatures. No such purpose holds with the relatively cold glow light. To make doubly sure that his electrodes would not be injured by the high temperatures of an arc, De Forest specified that the tungsten balls should be heavy. (2) Ball Electrodes. De Forest specified ball electrodes in his application. Ball electrodes provide a concentrated mass with a minimum superficial area. Prof. Ballard testified in the District Court that the ball shape is of advantage where the electrodes are to be operated at high temperatures but of no advantage otherwise. (3) De Forest specifies that the electrodes be "separated by a small gap, for example, 0.5 millimeter." Prof. Ballard testifies that this extremely small spacing of one-fiftieth of an inch is not desirable for a glow discharge which should have a spacing of not less than one-fourth of an inch up to several inches. He further testified that 0.5 mm. spacing was desirable for an inclosed tungsten arc light and that such a spacing distinctly indicates that an arc discharge was intended; that such a spacing permits an arc to be maintained at relatively low voltage and concentrates the arc so that an extremely brilliant point of light may be produced. (4) De Forest specified in his application a lamp "either evacuated or filled with some gas." Prof. Ballard testified in the District Court that it is impossible to operate a glow light if the lamps are either evacuated or filled, giving these terms their common and natural meaning, but an arc light may be operated with the lamp either evacuated or filled. This part of De Forest's disclosure is properly descriptive of an arc light but not of a glow light. That De Forest used the words with their common meaning appears from a contemporary event. In the specification of the De Forest patent 1,466,701 filed in the Patent Office on the same day, September 18, 1919, as the application he here relies on, De Forest uses the words "partially exhausted" in referring to a vessel which should not

be evacuated. It is only reasonable to assume that, if on this same day in 1919 he intended to specify a partially exhausted vessel or vessel containing some gas at low pressure as required for the glow light, he would not have used the term "evacuated." "Either evacuated or filled" plainly means one or the other of two alternative operations neither of which would produce an operative glow lamp. It cannot be contended that both the word "evacuated" and the word "filled" mean the same thing; i. e., a relatively low pressure of a suitable gas in the tube for a glow light. (5) De Forest specifies the use of "some gas, such at nitrogen, mercury vapor, etc., to make the light from such arc as rich as possible in ultra violet rays." Aside from the word "arc," this language is significant as indicating an arc discharge because the use of the gases named enables the light from an arc to be increased at the violet end of the spectrum as was well known in 1919. The use of mercury vapor is particularly desirable in an arc. On the other hand, mercury is very unsuitable in a glow lamp for sound recording because it condenses on the surface of the glass of the lamp, causing extraneous noises. The reference to violet rays has no significance as meaning a glow light. In this particular the acting Examiner in the Patent Office made a false assumption. (6) De Forest specifies the use of a color filter. All the experts agree that there is no possible reason for using a color filter with a glow lamp. It will merely absorb part of the useful light and will be a distinct detriment. On the other hand, they point out that advantages could be expected from using the filter with the arc lamp. In the District Court De Forest admitted this, and the admission is new evidence in this case. (7) De Forest specifies a minute ray obtained from a pin point aperture or focused to a point by a lens. Prof. Ballard testifies that a pin point aperture or focusing to a point by the use of a lens is undesirable with a glow light, which requires a larger opening such as a slit.

### Canadian Court Held in 1931 That De Forest Failed to Disclose the Invention.

Some while after the Board of Appeals of the Patent Office had made its findings, the Exchequer Court of Canada decided that the Canadian patent was void because the specification of the patent failed to disclose the invention. De Forest Phonofilm of Canada, Ltd., v. Famous Players Canadian Corporation, Ltd., 1931 Ex. C. R. 27. The specification, drawings, and claims of the Canadian patent are verbatim the same as the specification, drawings, and claims of the De Forest patent here at issue. In Canada, as in this country, De Forest first filed a so-called parent application in which he made the same disclosure of the arc light as he made in his application here, and in addition disclosed the filament lamp. The parent Canadian application corresponds in disclosure to the application filed here on September 18, 1919, upon which De Forest relies in the suit at bar. The same claims, 5 to 10, inclusive, of the corresponding Canadian patent, were sued on. At the trial, reliance was placed only upon claims 7 to 10, inclusive. These claims define the lamp as an "enclosed luminous gas discharge device," not "an electrically lighted lamp," as in claims 5 and 6. De Forest inserted the words, "enclosed luminous gas discharge device" by amendment, after learning about glow lamps in Germany, just as he did in his United States application.

Being asked in the Canadian case to explain what was new in the lamp described in his specification, De Forest stated: "Glow tubes of various sorts, Geissler tubes they were usually called, are very old in the electrical art; but prior to my invention no one had used or described or constructed a glow tube where the electrodes were close together, the tube filled with a partially exhausted nitrogen gas for the purpose of photographically recording the fluctuations of such a light. It was only by virtue of the fact that the electrodes were close together and the negative glow therefore being the only glow to consider, that this device became useful as a sound recording element."

The Canadian court gave thorough consideration to the above statement, as will appear from the following extracts:

"Whether the specification of De Forest discloses the invention it is claimed he made, that is, a negative glow lamp, and whether the same is sufficiently described in his specification may first be considered. The question for determination is not whether the plaintiff's lamp under certain conditions might not function as a negative glow lamp, it is whether the specification sufficiently describes and directs the use of a negative glow light as a light source, in the recording of sound upon a film, and whether it sufficiently sets forth the various steps in the construction or manufacture of a negative glow lamp and its operation or use. It was admitted by De Forest that neither the light from an arc discharge nor a positive glow were suitable for attaining the object of his alleged invention, and that a negative glow light alone was useful;

he must therefore be taken to mean, and it is in fact so contended, that in his specification he did describe as his invention, a negative glow lamp, its method of construction and its operation or use. * * * Now if that was the intention, it would appear to me, that nothing could conceivably be easier than for De Forest to describe with clarity and in very specific terms in his specification, as he did years later in his evidence in this action, the nature of the light source he had discovered as being new and useful in the photography of sound, the light source he alleges to have ultimately selected in preference to a gas flame, or a fine incandescent lamp filament, both of which he says he had considered and abandoned in favor of a negative glow lamp. There was no occasion, it seems to me, for ambiguous or uncertain language, in expressing a description of the invention and its method of construction, upon the ground that the invention was difficult to explain, for it was not difficult to explain. * * *

"Now, if De Forest chose to designate as his light source an arc lamp, there being such a lamp and ordinarily characterized by the incandescence of the electrodes, but which lamp he now says was not useful for his purposes and was not his invention: if he fails to mention by its well known name the useful lamp, which he says was his invention,—a glow lamp showing the negative glow only—and if he fails to describe it even in general terms so that those to whom the specification was addressed might readily recognize the invention as a negative glow lamp and nothing else, then, it seems to me the patentee is confronted at the start with the very formidable challenge that he has failed to describe properly and sufficiently his invention. There can be no justification for reading his specification otherwise than in its natural and ordinary sense. * * *

"The entire absence of reference to, or description of, a negative glow lamp or an enclosed luminous gas discharge lamp or device, the thing which De Forest says he invented, and the failure to plainly direct the use of a negative glow light as a source of light, is I think, fatal to the patent."

As to De Forest's contention that the word "arc" is a "generic term to cover any form of arc or glow," the Canadian court states: "If the term 'arc lamp' was at the time of the alleged invention so used as to comprehend a positive glow lamp, a mercury vapour lamp, and possibly various other sources of light, as is claimed by De Forest, then clearly it was all the more necessary to designate

by name, or to reveal in general terms at least, the negative glow lamp, not only that the invention might very definitely be known to others, but because a negative glow light was different from some other light sources falling, it is alleged by the plaintiff, within the popular designation of 'arc lamps,' but none of which were suitable for the purposes which De Forest had in mind."

Prior to the De Forest 1919 or 1920 application, glow lamps were old and well known as such. As to this the court, after referring to De Forest's statement that "glow lamps were old and well known as such," stated: "* * * But all that is a very good reason why such a lamp should be named and described in an application for a patent, if its selection or construction constituted an invention. * * * Then it was said that De Forest in the autumn of 1922 after returning to New York from Berlin with the dumb-bell lamp as the most advanced and practical lamp of which he had knowledge for the purposes in which we are interested, got into communication with Case, from whom he obtained a lamp operated with a negative glow and, it is claimed I think, that this was the first purely negative glow lamp that De Forest ever used in his experimental work. In 1923 De Forest used the Case lamp in a demonstration of sound motion pictures in New York. When De Forest and Case became estranged in their business relations, De Forest ceased using the Case lamp, and adopted the use of the Tri-Ergon lamp so called, controlled by European patentees, which was a negative glow lamp, and which I understand is the lamp the plaintiff now uses."

### Some Erroneous Findings of the Patent Office.

Throughout this opinion the errors of the Patent Office have been dealt with. However, it may not be amiss to point out specifically some of the errors of the Board of Appeals: (1) The Board argues that "a constant source of light" mentioned in De Forest's application calls for a glow light. In fact, these words do not indicate a glow lamp, because they are equally applicable to an arc lamp. (2) The Board next points out that "an arc discharge device must always have some means for starting it, which the De Forest patent does not disclose," and that it is inconceivable that De Forest would have employed an arc discharge without disclosing means for starting it. The record shows that inclosed arc lamps were then known, such as the 1918 Orange arc lamp, which did not require means for starting them. (3) The Board finds that "It is

well known in the art that an arc discharge will rapidly wear away the electrodes." In the District Court Prof. Ballard pointed out that the electrodes of inclosed arc lamps, such as the De Forest patent discloses, do not wear away to any greater extent than the ordinary household filament lamp. (4) The Board next finds that De Forest stated "in his patent that his electrodes were in a glass vessel below atmospheric pressure." There is no such statement in his patent. (5) The Board then finds it was well known in 1919 that an arc discharge tends to "wander over the surface of the electrodes and to flutter and sputter which would render it unsatisfactory for operation as a recording light," and therefore De Forest did not intend an arc light. The Board was evidently thinking of an old carbon arc lamp, because the statement is entirely untrue of an inclosed arc lamp, like the Orange or De Forest lamps, whose light is steady and constant. (6) The Board considered that the record did not show that in 1919 gases were used in connection with arc discharges to enhance the discharge. Certainly the present record does make that very showing. (7) The Board states: "The term 'arc lamp' seems to be sometimes used as a generic expression and has been applied to a mercury vapor lamp which is a glow lamp, see 'Electric Arcs' by Child, * * * page 87. There also seems to be a possibility of some confusion between arc lights and glow lights, see pages 2 and 3. * ÷ * " Here is a finding filled with error. A generic expression which embraces an inoperative device cannot teach the use of an operative glow lamp. Prof. Ballard testified in the District Court that a mercury vapor lamp is not a glow lamp, but is an arc lamp, and that the term "arc lamp" never embraced a glow lamp. Prof. Ballard showed that there was nothing in Child to justify the statement that there was confusion between arc lights and glow lights. (8) The Board also finds: "It would seem obvious that an arc would not be suited for the purpose disclosed and that those skilled in the art would regulate the current so as to obtain the 'constant source of brilliancy' specified in the original claims in the case." Here are three distinct errors: (a) It was not obvious in 1919 that an arc was not suited for the purpose. Before Engl et al. started their work with the glow light, no one appreciated that a glow light was proper for the purpose. (b) Whether you obtain an arc light or a glow light is not a mere question of regulating the current. The evidence shows that glow lamps require certain gas pressures within limits, widely spaced elec-

trodes unless very special precautions are taken, and that, if the lamp is "either evacuated or filled," it could not operate as a glow lamp no matter how regulated. (c) That one skilled in the art would regulate the current to obtain a "constant source of brilliancy" shows that the Board erroneously identified glow light with constant source of brilliancy. The above is a sufficient specification of error.

The New Evidence in the District Court, Together with the Old Evidence, Carries Thorough Conviction That the Patent Office Erred.

The new evidence offered at the trial of this suit supports plaintiff's main contentions. It consists of (1) the testimony of Prof. Ballard showing, among other things, erroneous assumptions of the Patent Office upon which some of its findings are based; (2) admissions by De Forest in the Canadian case and contradictions of the Patent Office proofs. It would have been impossible for plaintiff to have included this new evidence in the interference proceedings.

The following testimony of Prof. Ballard was not contradicted by any witness, and constitutes new evidence in the cause. He testified (1) that the use of gas in an inclosed arc lamp increased the ultraviolet light a hundredfold, and that this was known in 1919; yet the Examiner erroneously held that gases must be used in a glow lamp to produce any such result and that therefore a glow light was intended. (2) That the term "arc lamp" was not understood to embrace the glow lamp in 1919 or later. (3) That .5 mm. spacing of electrodes specified by De Forest distinctly indicates an arc lamp; (4) that, as shown in the test tube exhibits of 1927, De Forest could not operate his invention without radically departing from his disclosures in the following particulars: (a) In using right angular electrode supports; (b) in using special gas mixtures not known in 1919; and (c) in using insulation sleeves. (5) That mercury vapor was known in 1919 as suitable for a tungsten arc, but not for a glow lamp. (6) That the Board of Appeals misconstrued Child's text-book. (7) That the mercury vapor lamp is a form of arc lamp but not of a glow lamp. (8) That "filled" with gas, as expressed in the De Forest disclosure, indicates atmospheric pressure, since the arc lamp may be either "evacuated" or "filled" to atmospheric pressure, whereas a glow lamp may not. (9) That tungsten does not sputter with the gas pressure used in arc lamps, but will sputter with

the low gas pressures used in glow lamps; therefore tungsten is undesirable for glow lamps but highly desirable for arc lamps. The Patent Office assumed that sputtering resulted from high temperatures, whereas it results from very low temperatures. (10) That slow disintegration of tungsten is no obstacle to obtaining the "constant source of brilliancy" of an arc lamp. (11) That De Forest's disclosure of a spherical shaped lamp indicates an arc lamp. (12) That, in specifying that the light should be "focused to a point," De Forest indicates an arc lamp which has a concentrated light capable of being focused, whereas it would be impossible to focus the diffused light of a glow lamp. (13) That the Board erroneously relied on the expression "constant source of brilliancy" used in De Forest's original claims as teaching a glow light, whereas the words equally apply to arc and filament lights.

The Orange 1918 patent and the Moore and Schroter patents are new evidence in the case. The Orange patent discloses in 1918 the same type of inclosed tungsten lamp specified by De Forest in 1919. The Moore and Schroter patents show that glow lamps were sharply distinguished from arc lamps by De Forest's contemporaries. Moreover, the Orange patent disproves the Examiner's assumption that the arc in De Forest's type of lamp would necessarily destroy it.

New admissions and statements were made by De Forest in the Canadian case and were repeated in the District Court. These may be summarized: (a) De Forest now says he specified that the tungsten balls should be separated by as small a distance as practicable, in order to secure the negative glow and avoid the positive column; yet he admits that he had not learned that the positive column was objectionable until after filing his 1919 application. In 1919 he could not specify the .5 mm. spacing to squeeze out the positive column when at the time he did not know it was objectionable. (b) He admits the closer the spacing the easier it would be to establish the arc, whereas the glow lamp has no such limitation. It follows that his .5 mm. spacing teaches an arc such as is shown in the Orange patent. (c) He now contends the useful light for photographing sound "is always the negative glow" as distinguished from the positive glow; yet admits not knowing this fact until after his 1919 application was filed. (d) The Patent Office found the term "arc lamp" covered a glow lamp upon the assumption that the Cooper-Hewitt mercury vapor lamp was a glow lamp. De Forest admits the Cooper-Hewitt mercury vapor tube is not a glow lamp in the ordinary sense. It follows that the assumption of the Patent Office was mistaken. (e) De Forest admits that the satisfactory gas pressures for a glow light for the purpose are between .8 mm. minimum and 8 mm. maximum; yet his disclosure lacks all mention of pressure limitations. In fact his disclosure lacks any mention of a glow light. (f) He now admits that he knows no reason for using a filter with a negative glow, although he specified "a color filter * * * as I have found that the best results of recording sound waves photographically are thus secured." Prof. Ballard testified that the filter might be helpful with the arc, but would be detrimental with the glow. (g) He admits that he learned from Case of the argon and nitrogen gas mixture in 1922 and of the particular percentages for the mixture in 1926; yet he used the mixture in the 1927 test lamps and therefore derived these important features of the test lamps from a source outside his specification. (h) He agrees with Prof. Ballard that sputtering with the use of tungsten occurs at low temperatures as in a glow lamp and thereby contradicts his Patent Office testimony. (i) He now admits using a pin hole type of aperture in the summer or fall of 1919, which conflicts with his Patent Office testimony that he employed the slit form in his first apparatus and that his patent attorney chose the pin hole terminology. (j) De Forest now admits that as late as 1921 he had countless instances of trouble in obtaining satisfactory photographic records of sound; yet one skilled in the art should be able to practice his invention from the teaching of the 1919 application. If he could not, how could any other person ordinarily skilled in the art?

■ This new evidence in the District Court is not of the character condemned in Barrett Co. v. Koppers Co. (C. C. A. 3) 22 F.(2d) 395, but comes well within the meaning of new evidence as defined by Judge Chatfield before the amendment of the statute in General Electric Co. v. Steinberger (D. C.) 208 F. 699, 701, wherein he states:

"In some instances this additional testimony is offered as newly discovered evidence. In some instances the new testimony is presented to explain and rebut the conclusions of the Patent Office, upon the record which was before it. In some instances the new testimony is offered as to matters which were not thought relevant or necessary for presentation to the Patent Office in the previous hearing.

"In general it must be held that all such testimony is competent and must be considered by the court in the action under section 4915. * * * *"

I now pass to the law and particularly to the case of Morgan v. Daniels, 153 U. S. 120, 14 S. Ct. 772, 773, 38 L. Ed. 657, upon which defendants mainly rely. There the case was by agreement submitted to the Circuit (now District) Court (42 F. 451) upon the testimony offered in the interference proceeding. There was no new evidence. After referring to the differences of opinion expressed by the officials of the Patent Office as to the facts established by the testimony before them, the Supreme Court said: "Upon principle and authority, therefore, it must be laid down as a rule that, where the question decided in the patent office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, unless the contrary is established by testimony which in character and amount carries thorough conviction."

That case has been carefully and thoroughly considered in this circuit, and a further discussion of the rule laid down would be unprofitable. Victor Talk. Mach. Co. v. Brunswick-Balke-Collender Co. (D. C. 1923) 290 F. 565; De Forest Radio Tel. & Teleg. Co. v. Westinghouse E. & Mfg. Co. (D. C. 1924) 13 F.(2d) 1014; United States v. De Forest Radio Telephone & Telegraph Co. (D. C. 1927) 18 F.(2d) 338; Barrett Co. v. Koppers Co. (C. C. A. 1927) 22 F.(2d) 395; Harper v. Zimmerman (D. C. 1930) 41 F. (2d) 261.

It is settled that a suit under section 4915 is an original independent action in which all questions in issue are tried de novo upon all competent evidence, new and old. Victor Talk. Mach. Co. v. Brunswick-Balke-Collender Co., supra; Harper v. Zimmerman, supra.

The amendment of March 2, 1927, accomplished two distinct objects: (1) The procedure under section 4915 was simplified; and (2) the record in the Patent Office interference proceeding, in whole or in part, was made available for use in the equity suit and the evidential value of that record was defined.

Before the amendment, the applicant for a patent had his remedy by bill in equity to obtain the patent either upon refusal of the application by the Commissioner of Patents or upon refusal of such application by the Court of Appeals of the District of Columbia upon appeal from the Commissioner. The amendment abolished the latter right, and the applicant now seeking relief by bill in equity must file his bill within six months after the refusal of the Commissioner of Patents. The abolition of the last administrative appeal was doubtless in the interest of simplified procedure.

The second object of the amendment of section 4915 (35 USCA § 63) is contained in the following significant language: "In all suits brought hereunder where there are adverse parties the record in the Patent Office shall be admitted in whole or in part, on motion of either party, subject to such terms and conditions as to costs, expenses, and the further cross-examination of the witnesses as the court may impose, without prejudice, however, to the right of the parties to take further testimony. The testimony and exhibits, or parts thereof, of the record in the Patent Office when admitted shall have the same force and effect as if originally taken and produced in the suit."

I have found no authoritative interpretation of the language quoted.

Before the amendment, the record in the Patent Office was not available in the equity suit. The mass of depositions and other proof in the interference proceeding was deemed evidence in another suit. Their use in the equity suit was circumscribed by the general rules of evidence. The amendment of the section appears to have wrought a radical change. The Patent Office record is now admissible under conditions. Moreover the record "when admitted shall have the same force and effect as if originally taken and produced in the suit." Testimony originally taken in court is given such weight as the court sees fit to accord it. No special sanctity attaches to the testimony offered on behalf of one party because an administrative board adopted it in making its findings. It would seem logical to conclude that this court is charged with the duty of considering all the evidence, new and old, and deciding the case as an original suit in equity. It may well be doubted whether the doctrine of Morgan v. Daniels now applies to cases of this kind. But it is unnecessary to decide this doubtful question. Assuming that Morgan v. Daniels applies equally to the situation after as before the amendment of 1927, I find that the evidence submitted at the trial of this case, including that originally taken in the Patent Office, is sufficient in character and amount to carry thorough conviction that the Patent Of-

fice tribunals erred in awarding priority of invention to De Forest.

The plaintiffs Engl, Massolle, and Vogt are the joint and first inventors of the invention at issue, and the plaintiff American Tri-Ergon Corporation, their assignee, is entitled to receive a patent therefor.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½ (28 USCA § 723).